## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **FAITH SPIKER**, *individually and on behalf of all others similarly situated*, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| **RITE AID CORPORATION**, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Faith Spiker ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendant Rite Aid Corporation ("Rite Aid" or "Defendant"), and allege as follows, based upon information and belief, investigation of counsel, and the personal knowledge of Plaintiff.

### NATURE OF CASE

1.      This class action arises out of the recent targeted cyberattack and data breach where unauthorized third-party criminals retrieved and exfiltrated the highly sensitive data of Plaintiff and 2.2 million Class Members, as a result of Defendant's failure to reasonably and adequately secure this highly sensitive consumer data (the "Data Breach") and failure to adequately train its employees on reasonable cybersecurity protocols.

2.      During the regular course of conducting its daily business, Rite Aid—one of the largest pharmacies in the United States—acquires, collects, stores, and transfers its customers' sensitive personal data, including personally identifying information ("PII" or "Private Information"). More specifically, Rite Aid acquired Plaintiff's and other Class Members' Private Information in the course of providing pharmacy and retail services. Plaintiff and Class Members are current and former customers, who provide their sensitive Private Information to Rite Aid

directly or indirectly in connection with those services. According to Rite Aid, impacted customers made purchases at Rite Aid between June 6, 2017 and July 30, 2018 and presented the now-compromised forms of identification at the time of purchase.

3.      Rite Aid claimed that on June 6, 2024 an "unknown third party" impersonated a company employee to gain access to Rite Aid's business systems. Although Rite Aid claims that the incident was detected in 12 hours, it was not until June 17, 2024, nearly two weeks after the attack, that Rite Aid "determined" that the cyber-attacker acquired the PII of 2.2 million Rite Aid consumers, including Plaintiff and Class Members.

4.      Rite Aid revealed the affected customer information included: names, addresses, birthdates and driver's license numbers or other forms of identification presented at the time of purchase.[1]

5.      Rite Aid did not begin sending notices out to individuals affected by the Data Breach until mid-July. Plaintiff was not notified of the Data Breach until July 15, 2024, well over one month after the attack.[2]

6.      Indeed, it appears that Rite Aid waited until after the notorious ransomware group RansomHub announced its targeted attack of the drugstore chain to admit to the public that it had been successfully targeted in a cyberattack.[3] RansomHub is a relatively new threat group that demands ransom payments from victims in exchange for not leaking stolen files, often auctioning the files to the highest bidder if negotiations fail. According to a post on RansomHub's leak site, the cybercriminal group obtained "*over 10 GB of customer information equating to around 45*

---

[1] *See* Plaintiff Spiker's Notice of Data Breach (page 1), attached hereto as Exhibit A.
[2] *Id.*
[3] Lindsey O'Donnell-Welch, Rite Aid Breach Stemmed from Compromised Credentials, Decipher (July 16, 2024), https://duo.com/decipher/rite-aid-breach-impacts-2-2-million-customers.

*million lines* of people's personal information."[4]

7.      This was not even the first data breach Defendant was required to notify its customers about in recent years. In May 2023, Rite Aid announced that the PII and sensitive health data of 24,000 current and former customers was exfiltrated when a vulnerability in its systems was exploited by an unknown third party.[5]

8.      Given dozens of recent cyberattacks targeting large corporations like Rite Aid, and in particular entities like Defendant that are integral to the healthcare industry, and in light of its recent May 2023 data breach, it was highly foreseeable that Defendant would be the target of a cyberattack.

9.      Despite its duties under the law to Plaintiff and Class Members to protect and safeguard their Private Information, and the foreseeability of a data breach, Defendant failed to implement reasonable and adequate data security measures, which directly resulted in a Data Breach.

10.      Defendant owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their Private Information. Yet, Defendant maintained and shared Plaintiff's and Class Members' Private Information in a negligent and/or reckless manner. In particular, Defendant failed to adequately train its employees on proper cybersecurity measures.

11.      Plaintiff's and Class Members' Private Information was compromised due to Defendant's negligent and/or reckless acts and omissions and Defendant's repeated failure to

---

[4] Sergiu Gatlan, Rite Aid confirms data breach after June ransomware attack, Bleeping Computer (July 12, 2024), https://www.bleepingcomputer.com/news/security/rite-aid-confirms-data-breach-after-june-ransomware-attack/.
[5] Carlos Mathis, *Rite Aid customers' personal information accessed in data breach*, THE HILL (July 22, 2023), https://thehill.com/blogs/blog-briefing-room/4110730-rite-aid-customers-personal-information-accessed-in-data-breach/.

1002632.1

reasonably and adequately protect Plaintiff's and Class Members' Private Information.

12.    Now armed with the Private Information accessed in the Data Breach, cybercriminals can use or sell the Private Information to further harm Plaintiff and Class Members in a variety of ways including: destroying their credit by opening new financial accounts and taking out loans in Class Members' names; using Class Members' names to improperly obtain medical services; using Class Members' Private Information to target other phishing and hacking intrusions; using Class Members' Private Information to obtain government benefits; and otherwise assuming Class Members' identities.

13.    As a result of the Data Breach, Plaintiff and Class Members face a substantial risk of imminent harm relating to the exposure and misuse of their Private Information. Plaintiff and Class Members have and will continue to suffer injuries associated with this risk, including but not limited to a loss of time, mitigation expenses, and anxiety over the misuse of their Private Information.

14.    Plaintiff and Class Members have incurred, and will continue to incur, damages in the form of, among other things, identity theft, attempted identity theft, lost time and expenses mitigating harms, increased risk of harm, damaged credit, diminished value of Private Information, loss of privacy, and/or additional damages as described below.

15.    Accordingly, Plaintiff brings this action against Defendant, seeking redress for Defendant's unlawful conduct and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of implied contract; (iv) unjust enrichment; and (v) bailment.

16.    Through these claims, Plaintiff seeks damages in an amount to be proven at trial, as well as injunctive and other equitable relief, including reasonable and adequate improvements to Defendant's data security systems, policies, and practices, the implementation of annual audits

reviewing the same, adequate credit monitoring services funded by Defendant, and payment for the costs of repairing damaged credit as a result of the Data Breach.

## THE PARTIES

17.    Plaintiff Faith Spiker is a natural person, resident, and citizen of the Commonwealth of Pennsylvania.

18.    Defendant Rite Aid Corporation is a Delaware corporation with its principal office or place of business located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania.

## JURISDICTION AND VENUE

19.    This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because at least one member[6] of the putative Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 putative Class Members, and the amount in controversy exceeds $5 million exclusive of interest and costs.

20.    This Court has general personal jurisdiction over Defendant because Defendant has its principal places of business in this district, and Defendant operates in and engages in direct commerce at this District.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class Members residing in this District.

## DEFENDANT'S BUSINESS

22.    Rite Aid is an American drugstore chain and healthcare organization headquartered

---

[6] According to a notice filed by Defendant with Office of the Maine Attorney General, 30,107 Maine residents were affected by the Data Breach. Data Breach Notifications: Rite Aid Corporation (July 15, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c4bace65-85df-4fff-b99f-f8fd390bb41a.html.

1002632.1

in Philadelphia, Pennsylvania—and is one of the leading drug stores in the United States.

23.    Rite Aid offers a range of retail products and services, including prescription drug services.

24.    Plaintiff and Class Members are former or current customers who purchased items from Defendant, reportedly between June 6, 2017 and July 30, 2018.

25.    In the regular course of its business, Defendant receives, creates, handles, and transfers its customers' Private Information. Indeed, to receive products and services from Defendant, Plaintiff and Class Members were required to provide highly sensitive Private Information, including some or all of the following:

- Full names and addresses;

- Personal email addresses and phone numbers;

- Dates of birth;

- Driver's licenses (or other similar state identifications);

- Information related to credit and debit card numbers, bank account statements and financial account details.

26.    This sort of Private Information is extremely sensitive and is extremely valuable to criminals because it can be used to commit serious identity theft crimes.

27.    Rite Aid acknowledges the importance of Plaintiff's and Class Member's PII, stating in the Privacy Policy posted on its website "Rite Aid respects your concerns about privacy."[7]

28.    Upon information and belief, Defendant promises to, among other things: keep Private Information private; comply with healthcare drugstore industry standards related to data

---

[7] Privacy Policy, Rite Aid, https://www.riteaid.com/legal/privacy-policy (last accessed July 31, 2024).

1002632.1

security and Private Information, including FTC guidelines; inform consumers of its legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to the products and services Plaintiff and Class Members obtain from Defendant and provide adequate notice to individuals if their Private Information is disclosed without authorization.

29.     However, despite the existence of these duties, Defendant did not maintain adequate security to protect its systems from infiltration by cybercriminals or adequately train its employees on reasonable cybersecurity protocols.

30.     Defendant also promises that: "We will make any legally required disclosures of any breach of the security, confidentiality, or integrity of your personal information."[8] However, Defendant has yet to fulfill this obligation, as Plaintiff and Class Members still have not received satisfactory information from Defendant concerning the Data Breach.

31.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties owed to Plaintiff and Class Members and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

32.     Yet, contrary to Defendant's representations, Defendant failed to implement adequate data security measures, as evidenced by Defendant's admission of the Data Breach, which affects, to date, 2.2 million individuals.

**The Data Breach of Defendant's Systems**

33.     Beginning on or around June 6, 2024, an unknown third party impersonating a company employee gained access to certain of Defendant's business systems.[9]

_____

[8] *Id.*
[9] *See R*ite_Aid_-_Individual_Notice_Letter_Template.pdf, accessible at: Office of the Maine Attorney General,

34.     Per the Notice of Data Breach that Defendant sent to Plaintiff and Class Members, Rite Aid "determined by June 17, 2024, that certain data associated with the purchase or attempted purchase of specific retail products was acquired by the unknown third party. This data included purchaser name, address, date of birth and driver's license number or other form of government-issued ID presented at the time of a purchase between June 6, 2017, and July 30, 2018."

35.     Defendant waited until July 15, 2024 to even begin notifying affected consumers: over one month after the Data Breach occurred and days after the ransomware gang, RansomHub added Rite Aid to its leak site.

36.     Beginning July 15, Rite Aid sent Plaintiff and other Class Members a Notice of Data Breach which said the following:

**What Happened?**

On June 6, 2024, an unknown third party impersonated a company employee to compromise their business credentials and gain access to certain business systems. We detected the incident within 12 hours and immediately launched an internal investigation to terminate the unauthorized access, remediate affected systems and ascertain if any customer data was impacted.

37.     Omitted from the Notice of Data Breach is information explaining the root cause of the Data Breach, the vulnerabilities exploited by the cybercriminals, and Defendant's plans for data breach remediation to ensure similar breaches do not continue to occur and expose customers' Private Information. The Notice of Data Breach fails to mention that Rite Aid was similarly targeted in a data breach in May 2023. To date, these omitted details have not been explained or revealed to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is not repeatedly exposed to cybercriminals by Defendant.

---

30,107 Maine residents were affected by the Data Breach. Data Breach Notifications: Rite Aid Corporation (July 15, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c4bace65-85df-4fff-b99f-f8fd390bb41a.html.

1002632.1

38.    Upon information and belief, the criminal ransomware gang RansomHub specifically targeted Defendant based on its status as a major drugstore with enormous amounts of valuable Private Information—including the Private Information of Plaintiff and Class Members.

39.    Plaintiff further believes that her and Class Members' Private Information has been or soon will be disseminated on the dark web, to be available for purchase, because that is the *modus operandi* of cybercriminals, and the RansomHub gang has threatened exactly that: confirming in mid-July its intentions to leak Plaintiff's and Class Members' Private Information that was exfiltrated from Rite Aid's insufficiently secured networks.[10]

40.    As a major American corporation that collects, creates, transfers, and maintains significant volumes of Private Information, the targeted attack was a foreseeable risk which Defendant was aware of, had previously and recently been affected by, and knew they had a duty to guard against. It is well-known that covered entities, such as Defendant, which collect and store confidential and sensitive Private Information of millions of individuals, are frequently targeted by cyberattacks. Further, cyberattacks are highly preventable through the implementation of reasonable and adequate cybersecurity safeguards, including proper employee cybersecurity training.

41.    The Data Breach was a targeted cyberattack expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of consumers, like Plaintiff and Class Members.

42.    Defendant had obligations created by the FTC, contract, industry standards, and common law to keep its customers' and former customers', as well as their beneficiaries', Private

---

[10] Sergiu Gatlan, Rite Aid confirms data breach after June ransomware attack, Bleeping Computer (July 12, 2024), https://www.bleepingcomputer.com/news/security/rite-aid-confirms-data-breach-after-june-ransomware-attack/.

1002632.1

Information confidential and protected from unauthorized access and disclosure.

43.     Plaintiff and Class Members entrusted Defendant with their Private Information with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

44.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew, or should have known, they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

45.     Due to Defendant's inadequate security measures, failure to adequately train its employees on reasonable cybersecurity protocols, and its delayed notice to victims, Plaintiff and Class Members face a present, immediate, and ongoing risk of fraud and identity theft that they will have to deal with for the rest of their lives.

### The Data Breach was a Foreseeable Risk of which Defendant Was on Notice

46.     The attack was entirely foreseeable and avoidable.

47.     First, this Data Breach is not the only data breach Defendant suffered in recent years. In May 2023, Defendant experienced a data breach which exposed the PII of over 24,000 individuals, including their sensitive personal health information like prescriptions and insurance details.[11]

48.     Second, in a Joint Cybersecurity Advisory, the Federal Bureau of Investigation ("FBI") and the Cybersecurity & Infrastructure Security Agency ("CISA") has encouraged critical infrastructure organizations, such as Defendant, to implement their various recommendations as set forth in the advisory to reduce the likelihood and impact of inevitable ransomware and data

---

[11] Lindsey O'Donnell-Welch, Rite Aid Breach Stemmed from Compromised Credentials, Decipher (July 16, 2024), https://duo.com/decipher/rite-aid-breach-impacts-2-2-million-customers.

1002632.1

extortion efforts, including against similar ransomware attacks perpetrated by similar ransomware gangs.[12]

49.    Third, as a HIPAA-covered entity handling Private Information, Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare industry and other industries holding significant amounts of PII and personal health information preceding the Data Breach. Although personal health information does not appear to be implicated in this Data Breach, Defendant's status as a pharmacy and therefore a HIPAA-covered entity should have put Defendant on high alert as to the importance of its data security obligations.

50.    At all relevant times, Rite Aid knew, or should have known that Plaintiff's and Class Members' Private Information was a target for malicious actors.  Yet, Rite Aid failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class Members' Private Information from cyberattacks that Defendant knew directly about and should have guarded against.

51.    Healthcare entities suffered at least 337 data breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July 2022. The percentage of healthcare data breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[13]

52.    In light of recent high profile cybersecurity incidents at other healthcare entities and their partners—including HCA Healthcare (11 million patients, July 2023), Managed Care of

---

[12] *See e.g, #StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (Dec. 19, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-353a; *See e.g, #StopRansomware: ALPHV Blackcat*, AMERICA'S CYBER DEFENSE AGENCY (May 10, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-131a.
[13] *See* Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, HEALTH IT SECURITY: CYBERSECURITY NEWS (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

North America (8.8 patients, March 2023), Shields Health Care Group (2 million patients, March 2022), Broward Health (1.3 million patients, January 2022), OneTouchPoint (2.6 million patients, July 2022), Trinity Health (3.3 million patients, May 2020), and American Medical Collection Agency (25 million patients, March 2019)—Defendant knew or should have known its electronic records would be targeted by cybercriminals.

53.    Cyberattacks on medical systems have become so common that in 2019 the FBI and U.S. Secret Service issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

54.    This was not the FBI's first warning to the healthcare industry about the threat of cyberattacks.  Indeed, cyberattacks against the healthcare industry have been common for over a decade, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII[.]" The FBI further warned that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[15]  Later, in August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."

---

[14] *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[15] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

1002632.1

55.    According to an article in the HIPAA Journal posted on November 2, 2023, cybercriminals hack into medical practices for their highly prized medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights (OCR)] – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[16]

56.    According to the HIPAA Journal's 2023 Healthcare Data Breach Report, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[17]

57.    Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[18] In this case, Defendant failed to reasonably and adequately protect the stored records of millions of American consumers.

58.    Private Information, like that stolen from Defendant, is "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for

---

[16] Steve Alder, *Editorial: Why Do Criminals Target Medical Records*, THE HIPAA JOURNAL (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[17] Steve Adler, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.
[18] *See id*.

considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[19]

59.    The Data Breach resulting in the theft of Plaintiff's and Class Members' Private Information poses a known patient safety issue, including the interruption of important medical services.

60.    Given the wealth of information from the law enforcement and healthcare industry concerning the increasing prevalence of cyberattacks, Defendant knew and should have known about its data security vulnerabilities and implemented enhanced and adequate protection to protect and secure Plaintiff's and Class Members' Private Information.  Knowing the risk, Defendant failed to do so.

**Defendant's Failure to Comply with FTC Guidelines**

61.    The Federal Trade Commission ("FTC") has regularly promulgated guidelines for businesses, including HIPAA entities, which highlight the necessity of implementing reasonable data security practices. According to the FTC, the need for data security should factor into all business decision-making.

62.    For example, in 2016, the FTC updated its published guidelines, *Protecting Personal Information: A Guide for Business*, which laid out standard and accepted cyber-security measures for businesses to implement to protect consumers' private data. The guidelines advise businesses, *inter alia*, to: encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[20]

63.    The FTC's guidelines further advise businesses:  not to maintain PII longer than

---

[19] *See id.*
[20] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

1002632.1

necessary for authorization of a transaction; to limit access to sensitive data; to require complex passwords to be used on networks; to use industry-tested methods for security; to monitor for suspicious activity on the network; and to verify that third-party service providers have implemented reasonable security measures.[21] Yet, here, the Private Information that was breached was over *six and seven years old*, well beyond the duration of time necessary for Rite Aid's authorization of a transaction.

64.    To underscore the binding significance of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, pursuant to Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further identify the measures businesses *must* take to meet their data security obligations consistent with federal law.

65.    These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, No. 9357, 2016 WL 4128215, at *32 (F.T.C. July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act."), *vacated on other grounds, LabMD, Inc. v. Fed. Trade Comm'n*, 894 F.3d 1221 (11th Cir. 2018).

66.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to its customers' and former customers', as well as their beneficiaries', Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

67.    Defendant was at all times fully aware of its obligations to protect the Private

---

[21] *Id.*

Information of customers. Defendant was also aware of the significant repercussions that would result from their failure to do so.

**Defendant's Failure to Comply with Accepted Industry Standards for Data Security**

68.    In light of the evident threat of cyberattacks seeking consumers' Private Information, several best practices have been identified by regulatory agencies and experts that, at a minimum, should be implemented by healthcare service providers like Defendant to secure Plaintiff's and Class Members' Private Information, including but not limited to: educating and training all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; monitoring and limiting the network ports; protecting web browsers and email management systems; and limiting which employees can access sensitive data.

69.    On information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

70.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

**Defendant's Failure to Adequately and Reasonably Secure Plaintiff's and Class Members' Private Information has Increased Their Risk of Fraud and Identity Theft**

71.    Cyberattacks and data breaches at covered entities like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by

the attack.

72.    The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[22]

73.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal PII is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identify thieves who desire to extort and harass victims and take over victims' identities to engage in illegal financial transactions under the victims' names.

74.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique known as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

75.    The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent

---

[22] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf.

charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[23]

76.     Moreover, theft of Private Information is also gravely serious because Private Information is an extremely valuable property right.[24]

77.     Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

78.     It must also be noted there may be a substantial time lag – measured in years – between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

79.     According to the GAO, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

> GAO Report at 29.

80.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

---

[23] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited Dec. 11, 2023).
[24] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

1002632.1

81.    Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts, or the accounts of deceased individuals for whom Class Members are the executors or surviving spouses, for many years to come.

82.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[25] Private Information is particularly valuable because criminals can use it to target victims with frauds and scams. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

83.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

84.    For this reason, as a health insurer, Defendant knew or should have known about these dangers and strengthened its data and email handling systems as well as their training of employees in cybersecurity protocols accordingly. Defendant was on notice of the substantial and foreseeable risk of harm from a data breach, yet Defendant failed to properly prepare for that risk.

**Defendant's Failure to Adequately and Reasonably Protect Against The Data Breach was Reckless and Negligent**

85.    Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data to protect and/or to implement adequate data security oversight and practices necessary to safeguard stored Private Information. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

---

[25] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

1002632.1

b.      Failing to adequately protect customers' Private Information;

c.      Failing to properly monitor its own data security systems for existing intrusions;

d.      Failing to train its employees in the proper handling of emails containing Private Information and maintain adequate email security practices;

e.      Failing to train its employees train all staff members on the policies and procedures with respect to Private Information as necessary and appropriate for staff members to carry out its functions and to maintain the security of Private Information;

f.      Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

g.      Failing to adhere to industry standards for cybersecurity as discussed above; and

h.      Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Private Information.

86.     Defendant negligently, recklessly, and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access Defendant's computer network and systems which contained unsecured and unencrypted Private Information, upon information and belief, for multiple days.

87.     Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft. In addition, Plaintiff and Class Members also lost the benefit of the bargain they made with Defendant.

1002632.1

**<u>Plaintiff's and Class Members' Damages</u>**

88.     Given the sensitivity of the Private Information involved in this Data Breach, Plaintiff and Class Members have all suffered damages and will face a substantial risk of additional injuries for years to come, if not the rest of their lives. Defendant has done nothing to compensate Plaintiff or Class Members for many of the injuries they have already suffered. Defendant has not demonstrated any efforts to prevent additional harm from befalling Plaintiff and Class Members as a result of the Data Breach.

89.     Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach, which is now in the hands of cybercriminals.

90.     Since being notified of the Data Breach, Plaintiff Spiker has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to time with her families, work and/or recreation.

91.     Due to the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. This includes changing passwords, cancelling credit and debit cards, and monitoring her accounts for fraudulent activity.

92.     Plaintiff's and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

93.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

94.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to spend time dealing with the effects of the Data Breach.

1002632.1

95.    Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

96.    Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on Plaintiff's and Class Members' Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

97.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

98.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in similar cases.

99.    Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards but was not. Part of the price Plaintiff and Class Members paid to Defendant was intended to be used by Defendant to fund adequate security of their computer system(s) and Plaintiff's and Class Members' Private Information. Thus, Plaintiff and Class Members did not get what they paid for and agreed to.

100.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their accounts and sensitive information for misuse.

101.    Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket

expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

    b.  Purchasing credit monitoring and identity theft prevention;

    c.  Placing "freezes" and "alerts" with reporting agencies;

    d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

    e.  Contacting financial institutions and closing or modifying financial accounts; and

    f.  Closely reviewing and monitoring Social Security numbers, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

102.    Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

103.    Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life, including what ailments they suffer from, whether physical or mental—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of

any right to privacy whatsoever.

104.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff and Class Members have suffered anxiety, emotional distress, loss of time, loss of privacy, and are at an increased risk of future harm.

**Plaintiff's Experience**

***Plaintiff Spiker's Experience***

105.    Six or seven years ago, Plaintiff Spiker made purchases from Defendant Rite Aid which required that she provide Rite Aid with her sensitive Private Information, including her full name, address, date of birth, and government issued identification.

106.    Defendant obtained and stored and maintained Plaintiff Spiker's and Class Members' Private Information. Defendant owes Plaintiff Spiker a legal duty and obligation to protect her Private Information from unauthorized access and disclosure. Rite Aid notified Plaintiff Spiker on July 15, 2024, over one month after it had discovered the Data Breach, that her Private Information was compromised in the Data Breach and disclosed as a result of Defendant's inadequate data security practices.[26]

107.    Over three months after the Data Breach, Defendant has yet to confirm the exact information that was compromised in the Data Breach. However, on information and belief, Class Members' compromised data includes, but is not limited to: full name, address, date of birth, and government-issued identification (like driver's license numbers).

108.    Plaintiff Spiker is very careful with her Private Information. She stores any documents containing her Private Information in a safe and secure location or destroys the documents. Plaintiff Spiker has never knowingly transmitted unencrypted sensitive Private

---

[26] Attached as Exhibit "A" is the redacted July 15, 2024 Notice of Security Incident received by Plaintiff Spiker.

Information over the internet or any other unsecured source. Moreover, Plaintiff Spiker diligently chooses unique usernames and passwords for her various online accounts.

109.    As a result of the Data Breach, Plaintiff Spiker made reasonable efforts to mitigate the impact of the Data Breach after receiving the Data Breach notification letter, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring her credit.

110.    Plaintiff Spiker has been forced to spend multiple hours attempting to mitigate the effects of the Data Breach. She will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to time with her family, work and/or recreation. This is time that is lost forever and cannot be recaptured.

111.    Plaintiff Spiker suffered actual injury and damages as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of her Private Information, a form of intangible property that Defendant obtained from Plaintiff Spiker; (b) violation of her privacy rights; (c) the theft of her Private Information; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) increased out-of-pocket medical expenses; (g) failure to receive the benefit of her bargain; and (h) nominal and statutory damages.

112.    Plaintiff Spiker has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of her Private Information which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud.

113.    As a result of the Data Breach, Plaintiff Spiker anticipates spending considerable

time and money on an ongoing basis to try to mitigate and address harms caused by the Data

Breach. In addition, Plaintiff Spiker will continue to be at a present, imminent, and continued

increased risk of identity theft and fraud in perpetuity.

114.    Plaintiff Spiker has a continuing interest in ensuring that her Private Information,

which, upon information and belief, remains in Defendant's possession, is protected and

safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

115.    Plaintiff brings this action against Defendant individually and on behalf of all other

persons similarly situated.

116.    Plaintiff proposes the following Class definition, subject to amendment as

appropriate:

> **National Class: All persons or, if minors, their parents or guardians, or, if deceased, their executors or surviving spouses, who Defendant identified as being among those individuals whose Private Information was compromised in the Data Breach (the "Class").**

117.    Excluded from the Class are Defendant's officers, directors, and employees; any

entity in which Defendant have a controlling interest; and the affiliates, legal representatives,

attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members

of the judiciary to whom this case is assigned, their families and members of their staff.

118.    Plaintiff reserves the right to amend or modify the Class definition or create

additional subclasses as this case progresses.

119.    Numerosity. The Members of the Class are so numerous that joinder of all of them

is impracticable. As of July 15, 2024, Rite Aid has identified over 2.2 million individuals affected

by the Data Breach.

120.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

    b.   Whether Defendant failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.   Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

    d.   Whether Defendant owed a duty to Plaintiff and Class Members to safeguard their Private Information;

    e.   Whether Defendant breached its duty to Plaintiff and Class Members to safeguard their Private Information;

    f.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

    g.   Whether Defendant should have discovered the Data Breach sooner;

    h.   Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

    i.   Whether Defendant's conduct was negligent;

    j.   Whether Defendant breached implied contracts with Plaintiff and Class Members;

    k.   Whether Defendant were unjustly enriched by unlawfully retaining a benefit

conferred upon them by Plaintiff and Class Members;

l.    Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

m.   Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

121.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach.

122.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

123.    <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the data of Plaintiff and Class Members was stored on the same network and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

124.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to

individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, to conduct this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

125.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a classwide basis.

126.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.   Whether Defendant failed to timely notify the public of the Data Breach;

    b.   Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

    c.   Whether Defendant's security measures and workforce training protocols to protect its data systems were reasonable and adequate in light of best practices recommended by data security experts;

    d.   Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

    e.   Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

    f.   Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

1002632.1

127.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to names and addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CLAIMS FOR RELIEF

### COUNT I
### Negligence and Negligence Per Se
### (*On Behalf of Plaintiff and the Class*)

128.    Plaintiff re-alleges and incorporates by reference factual allegations above as if fully set forth herein.

129.    By collecting and storing the Private Information of Plaintiff and Class Members, in its computer systems and networks, and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer systems—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

130.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

131.    Plaintiff and Class Members are a well-defined, foreseeable, and probable group of patients that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

132.    Defendant's duty of care to use reasonable and adequate security measures and to

30

adequately train its workforce in reasonable data security protocols arose as a result of the special relationship that existed between Defendant and consumers, which is recognized by laws and regulations including but not limited to the FTC Act and common law. Defendant was in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

133.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

134.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

135.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain reasonable and adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

    b.  Failing to adequately monitor the security of its networks and systems;

    c.  Failing to ensure that its email systems had reasonable data security safeguards in place;

    d.  Failing to have in place reasonable and adequate mitigation policies and procedures;

    e.  Allowing unauthorized access to Plaintiff's and Class Members' Private

Information;

f.  Failing to detect in a timely manner that Plaintiff's and Class Members' Private Information had been compromised; and

g.  Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

136.    Plaintiff and Class Members have no ability to protect their Private Information that was or remains in Defendant's possession.

137.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Furthermore, the breach of security was reasonably foreseeable given Defendant's prior data breach, and the known high frequency of cyberattacks and data breaches in the healthcare industry, in which Defendant is a major player.

138.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to Plaintiff and Class Members.

139.    Defendant's conduct was grossly negligent and departed from reasonable standards of care, including but not limited to, failing to adequately protect the Private Information, and failing to provide Plaintiff and Class Members with timely notice that their sensitive Private Information had been compromised.

140.    Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

141.    Plaintiff and Class Members are also entitled to injunctive relief requiring

Defendant to, *inter alia,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

142.    The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that it was failing to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

143.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

**<u>COUNT II</u>**
**Breach of Implied Contract**
***(On behalf of Plaintiff and the Class)***

144.    Plaintiff re-alleges and incorporates by reference factual allegations above as if fully set forth herein.

145.    Defendant acquired and maintained the Private Information of Plaintiff and the Class that they received either directly or from their healthcare providers.

146.    When Plaintiff and Class Members paid money and provided their Private Information to Rite Aid, they entered into implied contracts with Defendant and its affiliates.

147.    Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

148.    Plaintiff and the Class were required to deliver their Private Information to

1002632.1

Defendant as part of the process of obtaining services and products provided by Defendant. Plaintiff and Class Members paid money, or money was paid on their behalf, to Defendant in exchange for services and products.

149.    Defendant directly solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant offers and provided their Private Information to Defendant.

150.    Defendant accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services and products to Plaintiff and Class Members.

151.    In accepting such information and payment for services and products, Defendant entered into implied contracts with Plaintiff and Class Members whereby Defendant became obligated to reasonably safeguard Plaintiff's and Class Members' Private Information.

152.    In delivering their Private Information to Defendant and paying for its products and services, Plaintiff and Class Members intended and understood that Defendant would adequately safeguard the data as part of that service.

153.    The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state or federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines on data security.

154.    The implied promises include but are not limited to: (1) taking steps to ensure that any workforce members who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its workforce members is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained workforce members; (4) designing and implementing

appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

155.    Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

156.    Had Defendant disclosed to Plaintiff and Class Members that they did not have adequate computer systems and security practices to secure sensitive data, Plaintiff and Class Members would not have provided their Private Information to Defendant.

157.    Defendant recognized that Plaintiff's and Class Members' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiff and Class Members.

158.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

159.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to take reasonable and adequate measures to safeguard their Private Information as described herein.

160.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members suffered and will continue to suffer damages in an amount to be proven at trial.

### COUNT III
### Unjust Enrichment
### *(On Behalf of Plaintiff and the Class)*

161.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

162.    This count is pleaded in the alternative to the breach of contract claims (Count II).

35

163.    Upon information and belief, Defendant funds any data security measures it implements entirely from its general revenue, including from money they make based upon representations of protecting Plaintiff's and Class Members' Private Information.

164.    There is a direct nexus between money paid to Defendant and the requirement that Defendant keep Plaintiff's and Class Members' Private Information confidential and protected.

165.    Plaintiff and Class Members paid Defendant a certain sum of money, which was used to fund any data security measures implemented by Defendant.

166.    As such, a portion of the payments made by or on behalf of Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

167.    Protecting the Private Information of Plaintiff and Class Members is integral to Defendant's business. Without their data, Defendant would be unable to provide goods and services, including the drugstore and pharmacy products and services that comprise Defendant's core business.

168.    Plaintiff's and Class Members' data and Private Information has monetary value.

169.    Plaintiff and Class Members directly conferred a monetary benefit on Defendant by purchasing goods and/or services from Defendant and by supplying Defendant with their Private Information, which has value, from which value Defendant derive their business value, and which should have been protected with adequate data security.

170.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

171.    Defendant enriched itself by saving the costs they reasonably should have

expended on adequate data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable and adequate level of security that would have prevented the Data Breach, Defendant instead chose to shirk its data security obligations to increase profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective data security measures. Plaintiff and Class Members suffered as a direct and proximate result of Defendant's calculated failures to provide the requisite reasonable and adequate data security.

172. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement reasonable and adequate data management and security measures that are mandated by federal law and industry standards.

173. Defendant acquired the monetary benefit and Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

174. If Plaintiff and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

175. Plaintiff and Class Members have no adequate remedy at law.

176. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect,

contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect Private Information in its continued possession; (vii) loss or privacy from the authorized access and exfiltration of their Private Information; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

177.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

178.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

### COUNT IV
**Bailment**
***(On Behalf of Plaintiff and the Class)***

179.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

180.    Plaintiff and Class Members provided Private Information to Defendant, which Defendant was under a duty to keep private and confidential.

181.    Plaintiff's and Class Members' Private Information is personal property and was conveyed to Defendant for the certain purpose of keeping the information private and confidential.

182.    Plaintiff's and Class Members' Private Information has value and is highly prized by hackers and criminals. Defendant was aware of the risks it took when accepting the Private

Information for safeguarding and assumed the risk voluntarily.

183.    Once Defendant accepted Plaintiff's and Class Members' Private Information, it was in the exclusive possession of that information, and neither Plaintiff nor Class Members could control that information once it was within the possession, custody, and control of Defendant.

184.    Defendant did not safeguard Plaintiff's or Class Members' Private Information when it failed to adopt and implement reasonable and adequate data security safeguards to prevent the known risk of a cyberattack.

185.    Defendant also did not safeguard Plaintiff's or Class Members' Private Information when it maintained Plaintiff's or Class Member's Private Information for years and years after the initial transactions occurred.

186.    Defendant's failure to safeguard Plaintiff's and Class Members' Private Information resulted in that information being accessed or obtained by third-party cybercriminals.

187.    As a result of Defendant's failure to keep Plaintiff's and Class Members' Private Information secure, Plaintiff and Class Members suffered injury, for which compensation—including nominal damages and compensatory damages—are appropriate.

<u>COUNT V</u>
**Breach of Fiduciary Duty**
***(On Behalf of Plaintiff and the Class)***

188.    Plaintiff re-alleges and incorporates by reference all factual allegations above as if fully set forth herein.

189.    In light of the special relationship between Defendant and Plaintiff and Class Members, Defendant became fiduciaries by undertaking a guardianship of the Private Information to act primarily for Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach

and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant do store.

190.    Defendant had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of their relationship to keep secure their Private Information.

191.    Defendant breached their fiduciary duty to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

192.    Defendant breached their fiduciary duty to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

193.    As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (vii) the diminished value of Defendant's services they received.

194.    As a direct and proximate result of Defendant's breach of its fiduciary duties,

Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment as follows:

a)    For an Order certifying this action as a Class Action and appointing Plaintiff as Class Representatives and her counsel as Class Counsel;

b)    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

c)    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)    Ordering Defendant to pay for not less than five years of credit monitoring services for Plaintiff and the Class;

f)    For an award of actual damages, compensatory damages, statutory damages, nominal damages, and/or statutory penalties, in an amount to be determined, as allowable by law;

g)    For an award of punitive damages, as allowable by law;

h)    Pre- and post-judgment interest on any amounts awarded; and,

i)    Such other and further relief as this court may deem just and proper.

1002632.1

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and

all issues in this action so triable as of right.

Dated: August 5, 2024

Respectfully submitted,

/s/ Mindee J. Reuben
Mindee J. Reuben (PA Bar Id. 75308)
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
1515 Market Street, Suite 1200
Philadelphia, PA 19102
Tel: 215-854-4060
Fax: 973-623-0858
mreuben@litedepalma.com

Joseph J. DePalma*
**LITE DEPALMA GREENBERG & AFANADOR, LLC**
570 Broad Street, Suite 1201
Newark, NJ 07102
Tel: 973-623-3000
Fax: 973-623-0858
jdepalma@litedepalma.com

James J. Pizzirusso*
**HAUSFELD LLP**
888 16th Street, N.W., Suite 300
Washington, D.C. 20006
(202) 540-7200
jpizzirusso@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, Fourteenth Floor
New York, NY 10004
(646) 357-1100
snathan@hausfeld.com

***Counsel for Plaintiff***

***\*Pro Hac Vice Forthcoming***

42

# EXHIBIT A



**RITE AID**

Rite Aid
200 Newberry Commons
Etters, PA 17319-9363

July 15, 2024



219 1 71220 *****************AUTO**ALL FOR AADC 180
FAITH SPIKER
PALMERTON, PA 18071-1710

## Notice of Data Breach

Dear Faith Spiker,

We are writing to tell you about a data security incident that may have exposed some of your personal information. We take the protection and proper use of your information very seriously. For this reason, we are contacting you directly to explain the circumstances of the incident.

### What happened?

On June 6, 2024, an unknown third party impersonated a company employee to compromise their business credentials and gain access to certain business systems. We detected the incident within 12 hours and immediately launched an internal investigation to terminate the unauthorized access, remediate affected systems and ascertain if any customer data was impacted.

### What information was involved?

We determined by June 17, 2024, that certain data associated with the purchase or attempted purchase of specific retail products was acquired by the unknown third party. This data included purchaser name, address, date of birth and driver's license number or other form of government-issued ID presented at the time of a purchase between June 6, 2017, and July 30, 2018. To confirm, no Social Security numbers, financial information or patient information was impacted by the incident.

### What we are doing.

We regret that this incident occurred and reported it to law enforcement, as well as federal and state regulators. We are also implementing additional security measures to prevent potentially similar attacks in the future. We take our obligation to safeguard personal information very seriously and are alerting you about this issue in case you would like to take any additional steps to help protect yourself.

To help relieve concerns and restore confidence following this incident, we have secured the services of Kroll to provide identity monitoring at no cost to you for 12 months. Kroll is a global leader in risk mitigation and response, and their team has extensive experience helping people who have sustained an unintentional exposure of confidential data. Your identity monitoring services include Credit Monitoring, Fraud Consultation, and Identity Theft Restoration.

Visit **https://enroll.krollmonitoring.com** to activate and take advantage of your identity monitoring services.
*You have until **October 13, 2024** to activate your identity monitoring services.*
Membership Number: **ENNP86647-P**

For more information about Kroll and your Identity Monitoring services, you can visit info.krollmonitoring.com.

Additional information describing your services is included with this letter.

ELN-22439 -71220